UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TIMOTHY MCGEE,<br><br>      Plaintiff,<br><br>    v.<br><br>CARTOON NETWORK, INC. AND<br>TURNER BROADCASTING SYSTEM,<br>INC.; ANDRE BENJAMIN 3000;<br>MOXIE TURTLE, INC.<br><br>      Defendants. | CIVIL ACTION NO. 08-CV-11818-PBS |

### MEMORANDUM AND ORDER

February 22, 2011

Saris, U.S.D.J.

### I. Introduction

Defendants in this copyright and breach of implied contract case have moved to enforce a settlement orchestrated in June 2009 for $12,000 and a release of all claims. The pro se plaintiff claims that his former attorney was without authorization to settle. The District Court (Harrington, J.) had previously granted The Cartoon Network's motion to enforce, but the First Circuit remanded for an evidentiary hearing and the case was redrawn. After considering the testimony of plaintiff and his

1

attorney, Jerrold Neeff, as well as various documentary evidence provided at that hearing, I **DENY** defendant's motion to enforce the settlement for $12,000 and a general release.

## II. Factual Background

Mr. McGee filed this case in October, 2008, alleging copyright infringement, breach of contract, misappropriation of trade secrets and violation of Massachusetts' consumer protection law, Mass. Gen. Laws c.93A. His claims related to a cartoon that he developed and promoted to the Cartoon Network in 1997, which he called "Music Factory of the 90's." The cartoon featured a diverse group of characters trying to break into the music scene in Atlanta, Georgia, and included musical numbers at the end of each episode (written and performed by a well-known artist) that embodied the themes or lessons of that week's episode. The Cartoon Network rejected the plaintiff's idea in 1997, stating that it did not meet with the network's current needs. However, in 2006, the Cartoon Network aired a cartoon called "Class of 3000," which featured a group of young musicians and is set in Atlanta, Georgia. The main character was played by Andre "3000" Benjamin, a well-established recording artist who wrote and produced original music for each episode.

Instead of filing an answer to Mr. McGee's complaint, the defendants engaged in settlement discussions with Mr. Jerrold Neeff, McGee's attorney. Mr. Neeff, in turn, discussed the

possibility of settlement with Mr. McGee. After a long series of email and telephone communications, in which Mr. Neeff explained the process of settlement (including the release of claims and dismissal of the case that it entails), Mr. McGee and Mr. Neeff agreed on a dollar amount for a settlement demand of $12,000 in early June, 2009.

Mr. McGee then left a voice message for Mr. Neeff in early June that stated, "I said - um - go ahead and do your settlement but we have a couple of issues we have to handle. [Inaudible] read all the contract make sure everything is - uh - appropriate; if it's not, we're not going to sign." Def. Ex. 1. Mr. Neeff understood this voicemail as an authorization to make a settlement demand of $12,000; he emailed Gordon Katz, attorney for The Cartoon Network, on June 10, 2009 to say "My client has authorized me to make a demand of $12,000. Please just let me know." Def. Ex. 2. Mr. Katz accepted the offer within an hour, replying, "The defendants accept, in exchange for a general release for all defendants and their affiliates and dismissal with prejudice of the pending action, and subject to execution of an acceptable settlement agreement, a draft of which I will forward within the next few days." Def. Ex. 3. Neeff agreed, and informed the Court of the settlement shortly thereafter. United States Magistrate Judge Collings entered a settlement order on July 9, 2009, ordering the parties to "file the papers necessary to remove this case from the Court's docket on or

3

before the close of business on Tuesday, October 6, 2009." Def. Ex. 5.

When McGee was faced with the settlement agreement, however, he cited several provisions that troubled him, including the requirement that all future submissions to the defendant corporations or their subsidiaries be pre-cleared by Time Warner. The Cartoon Network amended the agreement several times, but McGee still refused to sign. Eventually, Neeff withdrew as counsel for McGee; as Neeff explained at the hearing, "And I said, 'You know, Tim, respectfully, first of all, you already agreed to the settlement, and I cannot ethically represent you any further because I'm not going to misrepresent what you said to the Court,' and at that point we had already filed with the Court for the settlement." Evidentiary Hearing Transcript, November 23, 2010 ("Tr."), at 22.

The defendants moved to enforce the settlement agreement. McGee has opposed the motion, stating that Neeff never had authority to enter into a settlement agreement, and that the voicemail that Neeff relied on for authorization was meant to authorize settlement only contingent upon certain terms. Specifically, although conceding that he agreed to the $12,000 dollar amount, McGee asserts that he consistently demanded his name in the credits of "Class of 3000" and a share in the show's two Emmy awards in addition to a dollar amount. In support of this argument, he relies primarily on an email he sent to Neeff

4

in April of 2009, which stated, "My name in the credit's [sic] the 2 Emmy's [sic] and a dollar amount is what I am after and was always after." Docket No. 72.

### III. Discussion

As a preliminary matter, this Court has jurisdiction to enforce the settlement agreement because the case is still pending before the Court. See Petition of Mal de Mer Fisheries, Inc., 884 F.Supp.635, 637 (D. Mass. 1995) (Saris, J.). The questions raised by the above facts are whether the voicemail from McGee to Neeff in early June ("the voicemail") constituted actual authority to settle the case as required by law, and if not, whether Neeff nonetheless had apparent authority to settle the case by virtue of his email communications with Katz.

The apparent authority question can be disposed of quickly. "Apparent authority results from conduct by the principal which causes a third person reasonably to believe that a particular person ... has authority to enter into negotiations or to make representations as his agent." Bistany v. PNC Bank, NA, 585 F. Supp. 2d 179, 182 (D. Mass. 2008). In its July 8, 2010 per curiam opinion in this case, the First Circuit stated that "'customarily only the representation of the principal to the third party can create apparent authority, not the representation of the agent alone.'" McGee v. Cartoon Network, Inc., No. 10-1070, 2010 WL 2680830 at *14 (1st Cir. July 10, 2010) (quoting

5

United States v. International Bhd. of Teamsters, 986 F.2d 15, 20 (2d Cir. 1993)). Because McGee, the principal, never communicated directly with the defendants in this case, Neeff could have no apparent authority to settle.

With regard to actual authority, "an attorney, merely by virtue of his employment, lacks authority to compromise." Luis C. Forteza e Hijos, Inc. v. Mills, 534 F.2d 415, 418 (1st Cir. 1976). The First Circuit has stated that "an attorney may make a binding compromise on behalf of his client if the client has authorized him to do so. While there is a presumption that a settlement entered into by an attorney has been authorized by the attorney's client, rebuttal of the presumption renders any purported settlement ineffective." Michaud v. Michaud, 932 F.2d 77, 81 (1st Cir. 1991); see also Kinan v. Cohen, 268 F.3d 27, 32 (1st Cir. 2001).

In this case, a disputed factual matter exists as to whether McGee intended to authorize Neeff to settle his claims for $12,000, and no more. The early June, 2009 voicemail in which McGee explicitly instructed Neeff to "go ahead and do your settlement" appears on its face to be an authorization to settle. However, McGee claims that he agreed only to a dollar amount, and that settlement was contingent upon receiving specific items of non-pecuniary relief. Defendants counter that McGee understood the settlement process, and authorized Neeff to settle for $12,000 and a general release, but got cold feet when it came

6

time to sign the agreement.

In support of his version of events, McGee points to the second half of the voicemail, wherein he stated that if the written agreement was not "appropriate," he was "not going to sign." McGee also emphasizes his prior email to Neeff from April 28, 2009, in which he expressed his desire for his name in the credits and a share in the Emmy awards. He claims that he was agreeing only to a dollar amount in the voicemail, and when he referred to making sure the contract was "appropriate," he was implying that he would settle only in exchange for the $12,000 and these other two benefits.

The defendants counter that McGee's objections to the written settlement agreement did not involve his name in the credits or the two Emmys. Instead, they dealt with other issues like preclearing any future submissions to Time Warner or its subsidiaries. Defendants argue that McGee's complaints were merely an attempt to draw out the process and that, if he were genuinely concerned about the credits and the Emmys, he would have said so immediately. The defendants dispose of McGee's April 2009 email by arguing that the voicemail post-dated and preempted the prior email.

The First Circuit has stated that "[c]ontracts depend on objective manifestations of consent and not on uncommunicated subjective expectations." Mathewson Corp. v. Allied Marine Indus., Inc., 827 F.2d 850, 853 (1st Cir. 1987) (quoting Bushkin
7

Assocs., Inc. v. Raytheon Co., 815 F.2d 142, 146 (1st Cir. 1987). McGee's voicemail cannot constitute an objective statement of consent, because the two statements in the voicemail ("go ahead with your settlement" and "if not, we won't sign") render it fundamentally ambiguous. As such, McGee's subjective intent is the factual linchpin in determining what, exactly, he authorized Neeff to do.

With regard to a party's intent to be bound, the relevant factor is what the other party "would have reasonably understood that intention to be." Salem Laundry Co. v. New England Teamsters and Trucking Indus. Pension Fund, 829 F.2d 278, 280-281 (1st Cir. 1987). The question is therefore whether Neeff could have reasonably understood McGee's voicemail to mean that McGee consented to be bound by the settlement that Neeff later negotiated.

Prior to the voicemail, Neeff and McGee had discussed settlement intensively, as Neeff testified at the hearing.

> I advised Mr. McGee, of course, what the nature of the settlement agreement would be. He indicated to me that he fully understood that in order to accept the cash settlement that, of course, he's going to have to release all claims against all parties, and he understood that as well as the assigns and everyone else involved here and the standard form of release in addition to the stipulation of dismissal. I mean, that was discussed ad nauseam.

Tr. at 15. Neeff also emailed McGee that it would be expensive to have an expert, that it would be a difficult case on the merits and that McGee had not paid him his bill.

8

As a factual matter, it is unclear whether McGee understood that "releas[ing] all claims" precluded him from seeking his name in the credits or a share of the Emmys. He may have thought, not unreasonably, that he could negotiate the settlement terms until the point at which he signed his name to an agreement, and that only at that point would he release any *further* claims against the defendants. Cf. Gel. Sys. Inc. v. Hyundai Eng'g & Constr. Co., 902 F.2d 1024, 1027 (1st Cir. 1990) (finding contemplation of a formal, written contract "gives rise to a strong inference that the parties do not intend to be bound until the formal document is hammered out."). McGee argues that he believed this was how the process would work, since before the voicemail Neeff had told McGee (according to McGee's testimony) that "the only things he was worried about or concerned with was the dollar amount; everything else was irrelevant at this time." Tr. at 58.

After assessing McGee's emotional testimony, which is buttressed by the April email, I find that McGee proved that he did not intend to authorize Neeff to settle the case for $12,000 and a general release. Neeff remembers that McGee did not demand royalties until after the settlement agreement, and that he "dragged his feet" on signing the agreement because of the requirement dealing with subsidiaries. McGee was likely not an easy client, and his expectations may have been unrealistic. Nonetheless, given the prior history of communications and demands, the voicemail is too ambiguous to preempt the April 2009

9

email, which belies McGee's intent to settle without the added conditions. The defendants make a good point about McGee's initial objections to the written settlement agreement, but this is not enough to evince an intent to settle. Although courts favor settlement as a preferred alternative to costly, time-consuming litigation, a court should not enforce settlement upon a client who did not authorize settlement of her claims. <u>Mathewson</u>, 827 F.2d 850, 852 (1st Cir. 1987).

**ORDER**

Defendants' motion to enforce the settlement is **DENIED**.

<u>/s/ PATTI B. SARIS</u>
PATTI B. SARIS
United States District Judge