UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TIMOTHY McGEE,                          )
                                        )
        Plaintiff,                      )
                                        )      CIVIL ACTION NO.
v.                                      )      08-11818-DPW
                                        )
ANDRÉ BENJAMIN 3000, THE CARTOON        )
NETWORK, and TURNER BROADCASTING        )
SYSTEMS, INC.,                          )
                                        )
        Defendants.                     )

MEMORANDUM AND ORDER
March 20, 2012

This copyright action arises out of a treatment for an
animated television series developed by Plaintiff Timothy McGee
and unsuccessfully pitched to Defendant The Cartoon Network
("Cartoon Network") in 1997. Nearly ten years later, Cartoon
Network aired *Class of 3000*, which was co-created and co-produced
by Thomas Lynch and Defendant André Benjamin. Alleging that
Benjamin, Cartoon Network, and its parent company, Defendant
Turner Broadcasting Systems, Inc. ("TBS"), copied his cartoon
treatment, McGee filed suit against the defendants for copyright
infringement and various state law claims. Defendants Cartoon
Network and TBS have moved to dismiss, and McGee has filed
several motions to amend the complaint and two motions to enforce
an earlier discovery order. For the following reasons, I will
grant the defendants' motion to dismiss and deny McGee's motions.

1

# I. BACKGROUND

Plaintiff Timothy McGee is a resident of Massachusetts, but at times relevant to this action was an animation and graphic design student in Georgia. Cartoon Network and TBS (collectively, the "defendants") are the only defendants who have been served properly in this action. The other named defendant, André "André 3000" Benjamin, is an Atlanta native and musical artist/entrepreneur who is perhaps best known as half of the hip hop duo Outkast.[1] Cartoon Network and TBS both have principal places of business in Georgia.

A.  The Allegedly Infringed Work: *The Music Factory of the 90's*

In approximately 1997, McGee "developed characters, artwork, storylines, re-use (movie/internet) and marketing concepts" for

---

[1] In a submission before oral argument, McGee sought guidance on how properly to serve Benjamin and a Georgia company called Moxie Turtle, Inc., which is involved in the production of *Class of 3000*. Neither Benjamin nor Moxie Turtle were properly served in this action. According to his submission, in January 2008 McGee tasked his attorney with serving both Benjamin and Moxie Turtle, but the attorney failed to do so. McGee has submitted more than 100 pages of correspondence with his attorney to demonstrate his good faith effort to serve Benjamin. However, under Local Rule 4.1 and Federal Rules of Civil Procedure 4(m) and 6(b), McGee's opportunity to serve Benjamin or extend the time to do so for good cause had long expired by the time of oral argument. Thus, McGee's claims against Benjamin will be dismissed on alternative grounds of failure to effect service. McGee was given leave to amend his complaint on April 9, 2009 to add Moxie Turtle as a defendant, but McGee never filed his First Amended Complaint. Thus, Moxie Turtle is not properly subject to this suit. In any event, even if McGee had properly served Benjamin with his First Amended Complaint adding Moxie Turtle, McGee's claims would still fail for the substantive reasons discussed below in this Memorandum.

an animated serial work titled "The Music Factory of the 90's [*sic*]" (the "*Music Factory*").  McGee registered three copyrights for work related to the *Music Factory*: the original eight-page treatment,[2] Reg. No. VAu 218-1729, effective May 6, 1997; an updated treatment, Reg. No. VAu 416-298, effective January 23, 1998; and additional drawings and two pages of text, Reg. No. Vau 440-850, effective May 27, 1998.  The only copyrighted work allegedly infringed by the defendants in the Amended Complaint is No. 218-1729, which includes (1) letters to several production companies pitching *Music Factory*, (2) various articles discussing marketing of cartoons and spin-off merchandise, (3) sample contract language regarding ancillary merchandising, (4) a "Synopsis/OUTLINE/TREATMENT" for *Music Factory* in the form of a letter pitch, (5) character sketches with accompanying text describing the characters, and (6) a script of a proposed pilot episode entitled "The Birth of the Factory."[3]

McGee's "story format is based on the cartoon (*Fat-Albert and the Cosby Kids*) format, where at the end of each show the cartoon characters had a sing-a-long for that day [*sic*] lesson."

---

[2]  In the television and film industries, a "treatment" is a long-form outline that is written to describe the plot and style of a show.  It is generally written in the present tense, as if the author is walking through the show step by step and he describes the scenes and dialog.

[3]  A second treatment, included as Exhibit A to the McGee's briefing but not identified in the Amended Complaint, lays out additional episode summaries and characters.

In each episode, the group of central characters "interacts with established performers, featured as guest artists, who are integrated into each episode's storyline to impart lessons about the music industry and life." Each episode is built around three elements: "the conflicts between the cartoon characters' everyday life"; "topics that have been addressed on [Black Entertainment Television's] 'Teen Summit' some of which are: racism, stereotypes, image, dress codes, violence and most importantly responsibility"; and "the music and the artist who will appear on the show showcasing their talents and educating the kids." The guest stars "will become animated characters when entering the music factory or performing on the magic stage in the studio[ and then] return to their normal [live-action] state at the end of each episode after helping these kids complete the day [*sic*] lesson." McGee intended that a three-minute music video would be "reedited out" of the twenty-two minute episode to be marketed independently. The target audience of the show was "young viewers who [a]re consumers of cartoon programming and music programming."

Set in Atlanta, the work's central character is Tony "The Play Maker" Rich, a corporate attorney from a rich family who leaves his law firm to try become a successful music producer. In addition to The Play Maker, the animated cast includes five "young musicians, technologists, would-be executives and other

4

artists as they try to break into Atlanta's burgeoning music scene." The *Music Factory* also features a "host," like Bill Cosby in *Fat Albert and the Cosby Kids*, who would be someone "established in the music industry."

The script for the first episode, "The Birth of the Factory," establishes the premise for the show. Tony Rich leaves his law firm and, using money from his father, buys a production studio. His father appoints an attractive, female bank executive, Bobby, to monitor the investment, leading to tension and potential romance. Bobby and The Play Maker hire a young inventor, Brain, as technician and discover the stage-shy Mic. Check singing in a family band. The Play Maker runs into Whitney Houston (the guest star for the episode) at his old law firm, and she helps Mic. Check overcome her stage fright. The episode ends with Mic. Check recording a song while Whitney Houston sings along in the sound booth.

B.   McGee Presents *Music Factory* to Cartoon Network

According to the Amended Complaint, McGee pitched the *Music Factory* to Cartoon Network in 1997 for use in the network's "Adult Swim" programming, which was adult-oriented programming being developed at that time.[4]   In particular, he sent the

_____

[4]   Adult Swim debuted on Cartoon Network in 2001 with a single-night block on Sundays at 10 p.m. and expanded to nightly programming beginning at 9 p.m. *See* Sean Fennessey, *The "Bold, Crazy" World of Adult Swim*, L.A. Times, Feb. 20, 2011, *available at* http://articles.latimes.com/2011/feb/20/

treatment ("a demo reel, character sheets and a synopsis of the work") to Michael Lazzo, who was a senior vice president of programming and production at Cartoon Network and was overseeing the "Adult Swim" development.  In a letter dated May 28, 1997, Lazzo informed McGee that Cartoon Network was not interested in using the *Music Factory* because it did not meet Cartoon Network's programming needs.  Lazzo's letter stated that Cartoon Network was "currently focusing on creator driven shorts targeted at a slightly younger age group at this time.  We're returning all your materials herewith."  McGee alleges that he never heard from Cartoon Network again.[5]

C.    The Allegedly Infringing Work: "Class of 3000"

In November 2006, Cartoon Network launched *Class of 3000*, an animated half-hour musical series also set in Atlanta.  According to the Amended Complaint, the cast includes "young aspiring musicians" and a fictional host, Sunny Bridges, who is voiced by Benjamin and loosely based on his life.  The series includes original music, written and produced by Benjamin, that emphasizes the "theme and lessons of each storyline."  Benjamin and Thomas

---

entertainment/la-ca-adult-swim-20110220.

[5]  In his brief in opposition to the motion to dismiss, McGee asserts that Lazzo never returned the materials.  He also asserts, for the first time, that he unsuccessfully re-pitched the *Music Factory* to Lazzo in 1999 or 2000.

Lynch were co-creators and co-producers of *Class of 3000*.[6]  The
Amended Complaint alleges that Benjamin planned to market the
music and music videos used in the show independently and to
invite guest musical artist to appear on future episodes of the
show.

According to a treatment, *Class of 3000* chronicles "the
adventures of a classroom of musical outcasts and their whimsical
teacher at the Westley School for the Performing Arts in
Atlanta."  Although Sunny is a central character, an equally
featured character is Li'l D, a music student who reminds Sunny
of himself at a younger age.  Li'l D and his six classmates are a
multi-cultural group from different parts of the city, including
the real Atlanta neighborhoods of Buckhead (a wealthy area) and
Bankhead (a low-income housing area).  Sunny grew up in Bankhead
and, after years as a "musical superstar, A-lister, and
trendsetter," "left stardom to go back home to Atlanta in search
of his lost joy."  Sunny becomes a "part-whimsical, part magical
music teacher" who "lights the world up when he walks by," "sees
life differently than most," and lives in a magical house in the
woods.

---

[6]  In the Amended Complaint, McGee alleges that Benjamin is
the creator and producer of *Class of 3000*, but now seeks to add
Thomas Lynch and Lynch's production company as defendants in this
action.  The disposition of this and other motions to amend the
complaint will be discussed *infra* Part III.

The "world" of *Class of 3000* is based on real Atlanta neighborhoods and on fictional locations such as the magical woods and the school, although the school is based on the performing arts school that Benjamin attended in Atlanta as a child. The style of the animation is "[e]nergetic, stylish, influenced with a Southern flavor and relatable characters that have flawed and quirky comedic centers." Music is an integral part of the show, with each episode featuring original music animated by a guest animator.

D.  Procedural History

McGee filed suit against Benjamin, Cartoon Network, and TBS on October 30, 2008. He filed a motion to amend his complaint to include defendant Moxie Turtle on April 1, 2009.[7] As noted above, *see* Note 1 *supra*, neither Moxie Turtle nor Benjamin have been served in this action. In the four-count complaint, McGee alleges that by producing, airing, and licensing *Class of 3000*, the defendants infringed his copyright, breached an implied contract not to use his idea without compensation, misappropriated trade secrets, and violated Massachusetts's

_____

[7] Although McGee's motion to amend the Complaint to include defendant Moxie Turtle, Inc., was granted, McGee did not formally file the Amended Complaint. Because the Amended Complaint is in all respects identical to the original Complaint, with the exception of two brief references to Moxie Turtle in the Amended Complaint, and the defendants have addressed the Amended Complaint in their briefing on the pending motions, I will consider McGee's allegations in the Amended Complaint to be the operative allegations here.

consumer protection act, Mass. Gen. Laws ch. 93A.  McGee seeks

statutory damages, profits obtained by the use of his work, and

costs.

In July 2009, counsel for the parties reported a settlement

had been reached in this matter.  The defendants filed a motion

to enforce the settlement, and McGee opposed the motion, claiming

that he had not granted his attorney authority to accept any such

settlement.  On October 22, 2009, Judge Harrington granted a

motion filed by McGee's counsel, Jerrold Neeff, to withdraw.

Following a hearing, which McGee did not attend, the defendants'

motion to enforce the settlement was granted and the case was

dismissed.  Proceeding *pro se*, McGee appealed the enforcement

order, which the First Circuit vacated and remanded for an

evidentiary hearing.  *McGee v. Cartoon Network, Inc.*, 383 F.

App'x 12 (1st Cir. 2010) (*per curiam*).  On remand, Judge Saris

denied the motion to enforce, *McGee v. Cartoon Network, Inc.*, No.

08-cv-11818, 2011 WL 722470 (D. Mass. Feb. 22, 2011).

Thereafter, the case was reassigned to this session.

Before me now are the defendants' motion to dismiss (Dkt.

No. 77) and McGee's motions to amend the complaint to add various

parties as defendants (Dkt. Nos. 80, 105, 108, 109) and to

enforce a discovery order issued by Magistrate Judge Collings on

September 20, 2010 (Dkt. Nos. 90, 104).  In his briefing on the

motion to dismiss, McGee concedes that the trade secrets and

Chapter 93A claims (Counts III and IV, respectively) fail to state a claim for which relief can be granted.  Accordingly, Counts III and IV will be dismissed and only the copyright infringement and breach-of-contract claims will be considered here.

## II.  MOTION TO DISMISS

A.  Standard of Review

In order to survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citation and internal quotation marks omitted).  Factual allegations must "raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation," *Iqbal*, 129 S. Ct. at 1950.

In considering a motion to dismiss, I must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of McGee.  *Id*. at 1949.  However, neither "naked assertion[s]" nor "conclusory statements" are sufficient to support a claim.  *Id.*

I am "generally limited to considering facts and documents that are part of or incorporated into the complaint." *Giragosian*

*v. Ryan*, 547 F.3d 59, 65 (1st Cir. 2008) (citation and internal quotation marks omitted); *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 16 (1st Cir. 1998) (citations omitted) ("When . . . a complaint's factual allegations are expressly linked to — and admittedly dependent upon — a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)."). I "may also consider documents incorporated by reference in the [complaint], matters of public record, and other matters susceptible to judicial notice." *Giragosian*, 547 F.3d at 65 (citation and internal quotation marks omitted) (alteration in original). Consequently, I will consider the *Music Factory* treatment referenced by copyright number in the Amended Complaint, the *Class of 3000* episodes and treatment discussed in the Amended Complaint, the official copyrights, and the May 1997 letter quoted in the Amended Complaint.

However, without converting the motion to dismiss into a motion for summary judgment under Federal Rule of Civil Procedure 12(d), which I find inappropriate at this stage in the development of this case, I may not consider the exhibits attached to McGee's briefing. *Trans-Spec Truck Serv., Inc. v. Caterpillar, Inc.*, 524 F.3d 315, 321 (1st Cir. 2008) ("[I]f the district court chooses . . . to ignore supplementary materials

11

submitted with the motion papers and determine the motion under the Rule 12(b)(6) standard, no conversion occurs and the supplementary materials do not become part of the record for purposes of the Rule 12(b)(6) motion."). Similarly, I may not consider any new factual allegations set forth in the plaintiff's briefing, *Miller v. Suffolk Cty. House of Corr.*, No. 01-cv-11331, 2002 WL 31194866, at *2 n.1 (D. Mass. Sept. 27, 2002), even when the plaintiff is *pro se*, *Steele v. Turner Broad. Sys., Inc.*, 607 F. Supp. 2d 258, 263 (D. Mass. 2009) ("[A]ssertions in an opposition to a motion are not the equivalent of factual pleadings. To allow Steele to plead facts in such a manner would grant too much leeway to a *pro se* plaintiff at the expense of orderly procedure and would deprive the defendants of clear notice of the allegations against them.").

B.  <u>Copyright Infringement (Count I)</u>

In order to demonstrate copyright infringement, the plaintiff must establish "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 338, 361 (1991). The parties do not contest that McGee has a valid copyright in the treatment materials compiled in copyright registration No. Vau 416-298. Thus, only the second prong is at issue.

To show actionable copying "involves two steps: (a) that the defendant actually copied the work as a factual matter, . . . and (b) that the defendant's copying of the copyrighted material was so extensive that it rendered the infringing and copyrighted works 'substantially similar.'" *Situation Mgmt. Sys., Inc. v. Asp. Consulting LLC*, 560 F.3d 53, 58 (1st Cir. 2009) (citation and quotation marks omitted). "The plaintiff bears the burden of proof as to both elements." *Johnson v. Gordon*, 409 F.3d 12, 17 (1st Cir. 2005).

A plaintiff may satisfy the first element, actual copying, either by direct or indirect evidence of copying. *Johnson*, 409 F.3d at 18. When, as here, direct proof is absent, "the plaintiff may satisfy his obligation indirectly by adducing evidence that the alleged infringer enjoyed access to the copyrighted work and that a sufficient degree of similarity exists between the copyrighted work and the allegedly infringing work to give rise to an inference of actual copying." *Id.* The First Circuit has held that, when determining this "probative similarity," "a court must engage in dissection of the copyrighted work by separating its original, protected expressive elements from those aspects that are not copyrightable because they represent unprotected ideas or unoriginal expressions." *Id.* at 18–19. Any copying of ideas or unoriginal "constituent

elements" of the copyrighted work does not demonstrate probative similarity because those elements are unprotected.

If a court identifies any probative similarity from which it can infer actual copying, it must then "address the question of substantial similarity (and, thus, determine whether wrongful appropriation occurred)." *Johnson*, 409 F.3d at 19. Two works are "substantially similar if a reasonable, ordinary observer, upon examination of the two works would conclude that the defendant unlawfully appropriated the plaintiff's protectable expression." *Hassett v. Hasselbeck*, 757 F. Supp. 2d 73, 79–80 (D. Mass. 2010) (quoting *T-Peg, Inc. v. Vt. Timber Works, Inc.*, 459 F.3d 97, 112 (1st Cir. 2006)) (quotation marks omitted).

As with the probative similarity inquiry, the substantial similarity test includes a "requirement of originality." *Johnson*, 409 F.3d at 18. "Thus, in assessing whether substantial similarity exists, an overall impression of similarity may not be enough." *Id.* at 19 (citation omitted). If the impression of similarity arises from the similarity of unoriginal and noncopyrightable expressions or ideas, "it will not satisfy the predicate requirement of originality necessary to ground a finding of actionable copying." *Id.*

    1.   *Actual Copying*

McGee alleges, and the defendants do not dispute, that in 1997 he sent a treatment of *Music Factory* to Lazzo when he was a

Cartoon Network executive.  Thus, the defendants had access to the copyrighted treatment — or at least some derivative version of it.  The remaining question, therefore, is whether there is any probative similarity between the original, copyrightable elements of the *Music Factory* treatment and the *Class of 3000*.  *See Johnson*, 409 F.3d at 18.  Again, "[s]imilarities with respect to nonprotectable interests need not be considered."  *Franklin v. Ciroli*, 865 F. Supp. 947, 949 (D. Mass. 1994) (citation omitted).

In his Amended Complaint, McGee alleges that "the similarities of location, characters, content, format, and *dramatis personae* present a pattern of infringement" from which this court can infer copying by the defendants.  The defendants contend that this conclusory statement does nothing more than restate an element of a copyright infringement claim without any factual allegation to support it.  For that reason alone, the defendants argue, it should be dismissed under the pleadings requirements laid out in *Iqbal* and *Twombly*.  I have recently found allegations referring to similar "storylines," "names," "lives," and "actions" to be "simply too vague to be the basis for an infringement claim."  *Feldman v. Twentieth Century Fox Film Corp.*, 723 F. Supp. 2d 357, 366 (D. Mass. 2010).  Thus, the plaintiff must point to some more specific similarities than "location, characters, content, format, and *dramatis personnae*" for his claim to survive.

15

McGee identifies several specific similarities referenced in the Amended Complaint, namely, "(1) the facts that both creative works take place in Atlanta, Georgia[,] (2) that the host or main character of each work is from, or becomes involved in the music industry, and (3) that each main character has left his former job to commence each respective creative work." Even assuming that the factual allegations in the Amended Complaint are specific enough to meet the pleadings standard, however, McGee fails to allege sufficient probative similarity to demonstrate actual copying.

McGee's argument regarding probative similarity runs up against several hurdles often encountered by those who seek to enforce a copyright in a treatment for a television show, movie, or theatrical performance. Most notably, there are very few elements of the *Music Factory* treatment that are original; most of the alleged similarities are noncopyrightable "basic concepts and ideas" or "stock scenes and characters." *See Feldman*, 723 F. Supp. 2d at 366.

*First*, ideas and concepts are not protected by copyright. 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."); *see also*

*Matthews v. Freedman*, 157 F.3d 25, 27 (1st Cir. 1998) ("[T]he underlying idea [of a work] (*e.g.*, the travails of two star-crossed lovers), even if original, cannot be removed from the public realm; but its expression in the form of a play script (such as William Shakespeare's *Romeo and Juliet*) can be protected.").

Despite this limitation on copyright protection, McGee repeatedly argues that "Defendants may have taken [his] *idea* and used it as an inspiration for the *Class of 3000* show" and that "Defendants have failed to proffer any valid copyright to the *idea*." (emphasis added). Thus, to the extent that *Class of 3000* copies any ideas contained in the *Music Factory* treatment, such copying is not protected. For example, an animated television show that incorporates music, musicians, or original songs is not copyrightable. Nor is it, in any event, original: as McGee explains in his treatment, his cartoon format is itself based on *Fat Albert and the Cosby Kids*, which also incorporated music and an original song into an animated series.[8]

---

[8] The integration of music and animation, including the use of music or sing-alongs related to the episode's story or lesson, is a recurring format in animated series. *The Beatles* (1965–67) and *The Jackson 5ive* (1971–72) featured the bands' released songs and followed fictionalized versions of the real musical groups as they navigated the music industry and various unrelated adventures. The exploits of young musical artists and bands that include original songs also have been a mainstay of cartoon programming; *Josie and the Pussycats* (1970–72), *Fat Albert and the Cosby Kids* (1972–85), *Butch Cassidy and the Sundance Kids* (1973), *Alvin and the Chipmunks* (1983–90), *Jim Henson's Muppet*

*Second*, "courts have recognized that a copyright will not protect[] plots, subplots or themes." *Franklin*, 865 F. Supp. at 950 (citation omitted). This conclusion is consistent with the limitation of a copyright's protection to expressions of ideas, rather than the ideas themselves. Thus "the doctrine of *scènes à faire* denies copyright protection to elements of a work that are for all practical purposes indispensable, or at least customary, in the treatment of a given subject matter."[9] *Coquico, Inc. v. Rodriguez-Miranda*, 562 F.3d 62, 68 (1st Cir. 2009) (citations omitted).

The concept of struggling young artists is not an original one, and issues such as stage fright, the inability to get

---

*Babies* (1984-91), and *Fraggle Rock* (1987) all featured original songs and musical groups. Such cartoons and others have chronicled both the performing and production aspects of the music industry. In the 1980s show *Jem* (1985-88), for example, heroine Jerrica Benton is the owner of a music company who also (secretly) is the front-woman of her most successful band, Jem and the Holograms.

[9] For this reason, the Ninth Circuit has observed that "a concept for a film or television show cannot be protected by copyright." *Montz v. Pilgrim Films & Television, Inc.*, 649 F.3d 975, 979 (9th Cir. 2011) (*en banc*) (citing 17 U.S.C. § 102). Rather, the proper claim is the California common law tort of misappropriation of an idea. *Id.* The First Circuit recognizes that, in limited circumstances, "[i]nfringement can occur where — without copying a single line — the later author borrows wholesale the entire backdrop, characters, interrelationships, genre, and plot design of an earlier work." *TMTV, Corp. v. Mass. Prod., Inc.*, 645 F.3d 464, 470 (1st Cir. 2011). The Ninth Circuit's conclusion, though not the law in this circuit, nevertheless underscores just how difficult it is to plead an actionable claim for copyright infringement of a television treatment or concept.

recognized by the music industry, receiving mentoring from an industry insider or star, and overcoming technological and other obstacles to putting on a successful performance are natural corollaries of a cartoon following a group of young performers. *See, e.g.*, *Quaglia v. Bravo Networks*, No. Civ.A. 04-10460, 2006 WL 721545, at *2-3 (D. Mass. Mar. 21, 2006), *aff'd* No. 06-1864, 2006 WL 3691667 (1st Cir. Dec. 15, 2006) (*per curiam*) (determining that a reality show chronicling aspiring New York City actors during auditions did not infringe the copyright of a pitch for a show filming aspiring New York City actors at an audition that turns out to be fake). Likewise the plot device of a protagonist leaving one profession to embark on an unrelated profession with little experience but considerable passion is a familiar one. *See, e.g.*, A History of Violence (New Line Cinema 2005).

*Third*, "[s]tock characters, like stock *scènes à faire*, are not subject to copyright protection." *TMTV*, 645 F.3d at 469 (citation omitted); *see also Franklin*, 865 F. Supp. at 949 (citation omitted) ("A person may not obtain a copyright on a particular type of character, particularly if this character represents a recognizable stereotype.").

Because the physical appearance and artists' sketches of the characters in the two shows are very different, I must look to their attributes and actions. *See, e.g.*, *Fisher v. United*

*Feature Syndicate, Inc.*, 37 F. Supp. 2d 1213, 1219 (D. Colo. 1999), *aff'd* 203 F.3d 834 (10th Cir. 2000) (unpublished table opinion) ("In determining whether a character in a second work infringes a cartoon character, courts have generally considered not only the visual resemblance but also the totality of the character's attributes and traits." (quoting *Warner Bros. Inc. v. Am. Broad. Cos.*, 720 F.2d 231, 241 (2d Cir. 1983)). However, to the extent that those attributes and actions extend naturally from their stereotyped characteristics, they are not protectable. *Franklin*, 865 F. Supp. at 950 ("Stereotyped characters do not appear in a vacuum. A sheriff appears in a western saloon, a waitress appears in a diner, and a soldier appears in a war.").

McGee argues that there are similarities between his characters and those appearing in *Class of 3000*. In particular, he points out that Sunny and The Play Maker are both involved in the music industry: as a former superstar, Sunny comes from the industry, and as a new producer, The Play Maker is entering it. However, a connection to an industry alone is insufficient to render the characters substantially similar. Sunny is a superstar musician who becomes frustrated with the demands of the music industry (*e.g.*, fawning entourage, excessive touring, obsession with money) and goes home to his old neighborhood, where he becomes a music teacher at the performing arts school that he attended as a child. Sunny also possesses a magical

quality; for example, in the two-part first episode, wherever Sunny walks, the weather changes from rain to sunshine and flowers grow in his wake. By contrast, the Play Maker is a rich kid who became a lawyer to satisfy his father, is obsessed with music videos and the music industry, quits his job, buys a production studio, and tries to become a successful producer. Whereas Sunny is a mentor figure to his students, The Play Maker knows nothing about the music industry and learns as he goes along and with the help of others, including the guest stars. Thus, in certain fundamental senses the two characters are almost polar opposites.

McGee's other characters, young musicians and a tough executive, are largely stock characters. Even if they were copyrightable, they bear little resemblance to the young musicians in *Class of 3000*. McGee's characters are generally older — late teens or 20s — than the students of the *Class of 3000*, who appear to be preteens or younger. McGee's characters are also involved primarily — if not exclusively — in the hip hop and pop scene, whereas all of the *Class of 3000* students play classical instruments in a modern style.[10] The only similarities

---

[10] McGee's main *Music Factory* characters are: Mic. Check, a fifteen-year-old Asian singer, dancer, and high school student who has "[s]trong vocal[s]" but "[t]hinks she knows everything and doesn't shut up"; Baggy, a fourteen-year-old Hispanic singer, rapper, and high school student who dreams of "sign[ing] a deal with a major label" but has a lot of attitude; Brain, a seventeen-year old African American computer nerd who knows how

apparent from the treatments is that McGee has a character named Cam, and Kam Chin is a character in *Class of 3000*.  Other than the phonetic similarity, however, the characters are very different: Cam is a Caucasian teenager who is interested in photography and video technology but does not work well with others, and Kam Chin is an Asian, shy, nerdy keyboard player. Another similarity is that both cartoons have characters who are technology whizzes and (only sometimes successful) inventors, but this also is a stock character and the two, Brain and Philly Phil, are otherwise dissimilar.

In summary, figures involved in the music industry — musicians, singers, technicians, and producers — naturally appear in cartoons focusing on musicians and bands, and the figures portrayed in *Music Factory* and *Class of 3000* are similar only in

---

to operate a sound mixer but "[l]acks personality and charisma"; Cam, a seventeen-year-old director of photography, film, and video who is very stubborn and closed-minded, and does not work well in groups; and The Bomb, a talented art student aspiring to be a successful model and actress who is "[v]ery open, friendly, easy going, [and] easily taken advantage of."  The *Class of 3000* includes: Li'l D, the curious and energetic leader of the students, who plays the drums; Eddie, the rich kid who plays horns and wind instruments; Tamika, a beautiful, tough girl who plays hip hop on her harp; Philly Phil, the "Techno Geek" who plays the bass; Madison, the perpetually cheerful string player; Kim Chin, the impulsive percussionist who loves fashion; and her twin, Kam Chin, the shy and contemplative keyboard player.  The *Class of 3000* also has an extensive cast of ancillary characters at the school (*e.g.*, Principal Luna, Ms. Lopez, Coach Barnum, Mrs. Squatenchowder) and in the neighborhood (*e.g.*, Albert Schwartz, the owner of the pawn shop; Bianca Moon, owner of the organic food store; and Cheddar Man, the money-obsessed rival of Sunny).

their association with music and that common industry. This is not enough to demonstrate probative similarity. *See Fisher*, 37 F. Supp. at 1220 ("[A] similarity that inevitably stems solely from the commonality of the subject matter is not proof of copying." (citation and quotation marks omitted)).

*Fourth*, the location of a creative work is not copyrightable where that place is an actual location known to many. *See, e.g.*, *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986) ("[T]he South Bronx and the 41st Precinct are real places known to the public through media reportage. Accordingly, the notion of telling a police story that takes place there cannot be copyrightable."); *Alexander v. Murdoch*, No. 10 Civ. 5613, 2011 WL 2802923, at *7 (S.D.N.Y. July 14, 2011) ("[T]he choice of Los Angeles as a setting is not in itself copyrightable, regardless of the [limited] number of television shows set there." (citation omitted)); *Dunn*, 517 F. Supp. 2d at 545 (noting that the use of the same "contemporary locales" does not render two works of fiction similar). McGee places considerable emphasis on the fact that both shows take place in Atlanta. By copyrighting a cartoon set in that city, however, McGee does not acquire the exclusive right to use the city of Atlanta as a setting for animated series. This similarity, therefore, is not probative.

In conclusion, McGee points to no probative similarity between *Music Factory* and *Class of 3000*. While the script of the

23

*Music Factory* pilot and the sketches of that show's characters are original, copyrightable expression, McGee alleges no similarity of *Class of 3000* with those original elements. Instead, McGee alleges that the defendants copied his idea for an animated, musical cartoon set in Atlanta. Even if the defendants did copy his general idea and chosen locale, those elements of *Music Factory* are not copyrightable expression and thus not protected from copying. *See Johnson*, 409 F.3d at 18–19; *Feldman*, 723 F. Supp. 2d at 366–67.

Consequently, McGee fails to demonstrate actual copying, a required element of a copyright infringement claim. Accordingly, he fails to state a claim that satisfies the pleading requirements of Rule 12(b)(6), and his claim must be dismissed.

2. *Substantial Similarity*

Although I need not consider whether McGee's claim sufficiently alleges substantial similarity between *Music Factory* and *Class of 3000*, I am satisfied that McGee's claim fails in this respect as well. The substantial similarity test is a more "holistic[]" test aimed at comparing whether the two works as a whole are so similar that the "ordinary observer" would find that the second work "unlawfully appropriated the plaintiff's protectable expression." *Johnson*, 409 F.3d at 18. As discussed in the preceding section, McGee fails to point to any *protectable expression* of *Music Factory* that is similar to *Class of 3000*:

24

with the exception of the Atlanta location, the settings (production studio versus performing arts school), the main protagonists (novice music executive versus experienced superstar-turned-teacher), and the cast of characters are different. More illustrative, however, is the difference in format and tone of the shows.

Much like *Fat Albert and the Cosby Kids*, *Music Factory* employs a host format and mixes animation and live action. While a live-action Bill Cosby introduced his animated gang in *Fat Albert and the Cosby Kids*, McGee's treatment proposes that a well-known figure in the music industry act as host to *Music Factory* and states that the guest artist will fade in and out of live action and animation. By contrast, there is no live-action element to *Class of 3000* and no host. Both feature a short music video, but that is not an original element.

Additionally, the mood and tone of the series are very different. *See Cavalier v. Random House, Inc.*, 297 F.3d 815, 824 (9th Cir. 2002) (concluding that the difference in "pace, dialogue, mood, and theme" of the two children's stories — one "fun" and "very lighthearted" and the other ""more serious and instructional" — renders them not substantially similar). *Class of 3000* is a children's cartoon that is fast-paced, "whimsical," and laden with traditional cartoon slapstick comedy. By contrast, *Music Factory* is aimed at an adult audience, serious in

tone, not comedic, and uses more slang. Moreover, *Class of 3000* is full of fantasy and magic (for example, Sunny lives in a magical forest with a bear who drives a convertible and a boombox-toting rabbit), whereas *Music Factory* is grounded in reality.

Additionally, the themes of the shows are in conflict. In the first episode of the *Music Factory*, the music executive is portrayed as an heroic exemplar for The Play Maker, while in the first two episodes of *Class of 3000*, music executives are portrayed as intermeddling, greedy bad guys who threaten to take Sunny away and destroy his love of music. The Play Maker aspires to enter the music industry, while Sunny aspires to escape it. Thus, in *Music Factory*, pursuit of money and fame is celebrated, whereas those attributes are portrayed more negatively in *Class of 3000*, where the love of music and creativity is emphasized.

Consequently, the general feel and themes of the two works are so different that no ordinary observer would consider them substantially similar. Like the unsuccessful plaintiffs in *Feldman*, *Dunn*, and *Alexander*, McGee "fails to understand the fundamental difference between idea and expression. Plaintiff would ask this Court to grant him a monopoly on unprotected elements, such as themes, emotions, and attitudes on which [cartoons] commonly rely." *Fisher*, 37 F. Supp. 2d at 1220 (concluding that comic strips, the medium at issue in the case,

"commonly rely on similar themes, 'meanings,' and attitudes").
The Copyright Act prohibits this outcome and, accordingly, I will
dismiss McGee's copyright infringement action.

C.  Breach of Implied Contract (Count II)

   *1.  Choice of Law*

   Before I consider whether McGee has adequately pled a claim
for breach of an implied contract in Count II, I must determine
which law applies.  "Massachusetts generally follows a functional
approach to resolving choice of law questions on substantive
matters, eschewing reliance on any particular choice-of-law
doctrine." *Lou v. Otis Elevator Co.*, 933 N.E.2d 140, 583 (Mass.
App. Ct. 2010).  In this case, the alleged implied contract was
formed in Georgia, McGee developed and pitched his treatment for
*Music Factory* in Georgia, and the alleged breach and unlawful
copying occurred in Georgia, where Cartoon Network and TBS are
headquartered.  The only connections that Massachusetts has with
the claim alleged is that Massachusetts is the forum state and
that the plaintiff currently resides in Massachusetts.
Consequently, Georgia law applies here.

   *2.  Analysis Under Georgia Law*

   Under Georgia law, McGee's claim is best construed as a
claim for "misappropriation or conversion of an unpatented or
unpatentable product or idea." *Wilson v. Barton & Ludwig, Inc.*,
296 S.E.2d 74, 76 (Ga. Ct. App. 1982) (considering the alleged

27

misappropriation of a business concept). The *Wilson* court held
that "[w]here the plan had been divulged to the defendant in
confidence with the expectation of compensation for the use of
the idea, the court was willing to construe the arrangement
between the parties as 'an implied agreement not to use or
divulge the information.'" *Id.* at 76–77 (quoting *Monumental
Props. of Ga., Inc. v. Frontier Disposal, Inc.*, 282 S.E.2d 660
(Ga. Ct. App. 1981)). The Georgia Court of Appeals has
considered a claim alleging misappropriation of a television
concept under this doctrine. *See Jones v. Turner Broad. Sys.,
Inc.*, 389 S.E.2d 9, 11 (Ga. App. Ct. 1989), *cert. denied*, 498
U.S. 993 (1990).

Under Georgia law, "[t]he elements essential to a recovery
for the wrongful appropriation or conversion of an unpatented or
unpatentable idea or product are: 1) the idea must be novel; 2)
the disclosure of the idea must be made in confidence; 3) the
idea must be adopted and made use of by the defendant; and 4) the
idea must be sufficiently concrete in its development to be
usable." *Id.* at 10–11 (quoting *Morton B. Katz & Assocs., Ltd. v.
Arnold*, 333 S.E.2d 115, 117 (Ga. App. Ct. 1985)). In the Amended
Complaint, and weighing all assertions and inferences in favor of
the plaintiff, McGee adequately alleges the first, second, and

fourth elements.[11]  However, for the reasons laid out in the

preceding section, *see supra* Part II.B, McGee fails to allege the

third required element of the claim.  The defendants did not copy

McGee's idea, and, consequently, McGee fails to state a claim for

misappropriation of an idea.

McGee has failed to allege an actionable breach-of-contract

claim in Count II and, even when construing the Amended Complaint

liberally as alleging a claim of misappropriation of an idea

McGee fails to allege a claim under Georgia law, for which relief

may be granted.  Consequently, I will dismiss Count II.

### III.  MOTIONS TO AMEND COMPLAINT

McGee has filed four motions seeking to add defendants to

the Amended Complaint.  (Dkt. Nos. 80, 105, 108, and 109.)  He

has not attached any proposed amended complaint and thus alleges

---

[11]  McGee arguably also fails to adequately plead the first
element of the claim.  While the drawings and script contained in
the copyrighted treatment were copyrightable expressions, the
idea of a animated television series following aspiring young
musicians is not a novel one.  The Georgia Court of Appeals has
held that, "[t]o be novel the concept must be peculiar and not
generally available or known to others in the trade.  To be
protected, an idea must possess genuine novelty and invention,
which it cannot have if it merely is an adaptation of existing
knowledge, albeit a clever, useful, or sensible adaptation."
*Jones*, 389 S.E.2d at 11 (citation omitted).  To the extent that
the defendants adopted or used McGee's *Music Factory* idea,
therefore, it does not involved novelty.  The idea of a
television show following the exploits and aspirations of
aspiring young musicians is well known and even the setting of a
performing arts school — which was not part of McGee's idea — has
been established at least since the movie and live-action series
*Fame* first aired in the 1980s.

no additional factual allegations that would be incorporated into the Amended Complaint to support the addition of these new defendants. However, even if he had, amendment would be inappropriate because it would be futile.[12]

In general, "[t]he decision to grant a motion for leave to amend falls within the trial court's discretion." *Jaundoo v. Clarke*, 690 F. Supp. 2d 20, 27 (D. Mass. 2010) (citing *Sheehan v. City of Gloucester*, 321 F.3d 21, 26 (1st Cir. 2003)). Leave to amend "shall be freely given when justice so requires," Fed. R. Civ. P. 15(a), so long as there is no adequate basis for denial such as "futility, bad faith, undue delay, or a dilatory motive on the movant's part," *Hatch v. Dep't for Children, Youth & Their Families*, 274 F.3d 12, 19 (1st Cir. 2001). In cases such as this, in which discovery is yet to be completed and no summary judgment motion has been filed, futility is determined by the Rule 12(b)(6) standard. *Id.*

McGee cannot succeed in any claim under Count II against any

---

[12] The defendants request that I deny the motions to amend the complaint to include Apple, Sony Entertainment, Watkins, and Shee Entertainment on the grounds that McGee failed to comply with Local Rules 7.1 and 15.1 before filing his motions. (Dkt. Nos. 85, 111, 112.) Local Rule 7.1 requires that a party confer with opposing counsel before filing a motion, and Local Rule 15.1 requires a plaintiff to serve a proposed defendant before filing a motion to amend the complaint to include that individual as a party. Compliance with local rules of procedure is mandatory, even for *pro se* parties. *See Graham v. Sabol*, 734 F. Supp. 2d 194, 199 & n.4 (D. Mass. 2010). Consequently, noncompliance with these rules is an alternative ground for denying these three motions (Dkt. Nos. 80, 108, 109.).

of the proposed defendants because they were not party to any alleged agreement between Lazzo, of Cartoon Network, and McGee regarding McGee's *Music Factory* pitch.  Amendment to include the proposed additional defendants in Count II thus would be futile.

With respect to the proposed additional parties in three of the four motions to amend, McGee fails to allege a required element of a copyright infringement claim.  McGee seeks to add Apple, Inc., and Sony Entertainment because they sell and advertise episodes of *Class of 3000*.  (Dkt. Nos. 80 and 108.) However, McGee fails to allege that Apple or Sony Entertainment had access to or copied his copyrighted *Music Factory* treatment. Consequently, adding these parties would be futile.

Similarly, while McGee alleges that Tionne Tenese Watkins had access to his treatment and minimally participated in the *Class of 3000* project as an uncredited voice actress, he fails to allege that she copied his treatment or that she or her production company, proposed defendant Shee Entertainment, had any role in the production or creation of *Class of 3000* (other than as a friend of Benjamin, which is too attenuated to pass muster under *Iqbal*).  (Dkt. No. 109.)  Consequently, it likewise would be futile to amend the complaint to include either Watkins or Shee Entertainment as defendants.

McGee's motion to amend the complaint to add Tom Lynch and Tom Lynch Company as defendants alleges sufficient facts to

connect Tom Lynch and his production company with the creation and production of *Class of 3000*. (Dkt. No. 106.) And, it appears that service of counsel for Cartoon Network and TBS is sufficient to comply with Local Rule 15.1's service requirement with respect to these proposed defendants. However, for the same reasons that I found that the Amended Complaint failed to allege a claim of copyright infringement against Cartoon Network and TBS, *see supra* Part II, I find that McGee fails to sufficiently plead copyright infringement by Tom Lynch and Tom Lynch Company. Amendment to include these additional defendants, therefore, would be futile.

For these reasons, I decline to exercise my discretion to allow amendment of the complaint. To allow McGee, even when proceeding as a *pro se* litigant, repeatedly to amend the complaint on the basis of such flimsy factual allegations would be inappropriate. *See Steele*, 607 F. Supp. 2d at 263.

### IV. MOTIONS TO ENFORCE ORDER OF SEPTEMBER 20, 2010

McGee has filed two motions seeking to enforce the September 20, 2010,[13] discovery order of Magistrate Collings. (Dkt. Nos. 90 and 104.) In that order, Magistrate Judge Collings ordered the defendants to disclose "copies of the copyrights held by the defendants subject to certain limitations" within thirty days of

---

[13] The original motion seeks enforcement of a September 20, 2011, motion, but it is clear from the record that McGee refers to the electronic order dated September 20, 2010.

any decision by the court on the validity of the settlement. The disclosure must be "only to the extent that the copies of the copyrights are within the possession, custody and/or control of the defendants who have been served," namely Cartoon Network and TBS.

The motion to enforce the settlement was denied on February 22, 2011, and the defendants sent McGee copyright information regarding *Class of 3000*-related copyrights on June 2, 2011, "in accordance with Magistrate's [*sic*] Collings' September 20, 2010 order." According to the disclosed documents, there are thirty-one copyrights for *Class of 3000*, including twenty-seven episodes (including a Christmas special), a "character art pack," and three versions of "music volume one."

Despite this disclosure, McGee remains unsatisfied, contending that the documents produced were not those that he requested at a teleconference between the parties and Magistrate Judge Collings. It is not entirely clear from the briefing what additional copyright evidence he has requested, but it appears that he seeks a copyright for the original treatment or pitch by Lynch to Lazzo for *Class of 3000*. In briefing on the motion to dismiss, McGee states that he "does not believe that [the defendants] have copyrights for the original treatment, allegedly prepared by Tom Lynch." The date on the purportedly missing copyright, McGee seems to contend, would prove that the idea

post-dated his *Music Factory* copyright. The defendants assert that they have disclosed all copyrights related to *Class of 3000* material. They have also produced a three-page text treatment for a show entitled "Sophistifunk," which was an earlier incarnation of *Class of 3000* created by the Thomas Lynch Company; a set of the *Class of 3000* episodes on DVD, and a treatment of *Class of 3000* (although it is unclear whether this is the copyrighted "character art pack").[14] One week prior to the hearing on this motion, the defendants produced a seven-page treatment of an adult-oriented cartoon, entitled "Andre 3000 Project." The defendants maintain that neither the Sophistifunk nor the Andre 3000 Project are copyrighted.

Given the defendants' disclosures, I find that McGee's motions to enforce the discovery order are moot. The defendants have produced both copyrights and the requested treatments. Whether the Sophistifunk or Andre 3000 Project treatments are registered with the U.S. Copyright Office are, in any event, irrelevant to the claim that *Class of 3000* infringes *Music Factory*. Accordingly, I will deny the motions.

### V. CONCLUSION

For the reasons set out more fully above, the Defendants' motion to dismiss (Dkt. No. 77) is GRANTED. Plaintiff's motions to amend the complaint to add defendants (Dkt. Nos. 80, 105, 108,

---

[14] McGee has searched for a copyright for the Sophistifunk treatment, finding two unrelated copyrights for songs by that title dated 1981 and 2001.

and 109) are DENIED, and Plaintiff's motions to enforce (Dkt. Nos. 90 and 104) are DENIED as moot.[15]

/s/ Douglas P. Woodlock
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

---

[15] Several of the plaintiff's pending motions were filed incorrectly on the electronic docket. Because McGee proceeds in this action *pro se*, I will liberally construe Docket Nos. 80, 105, 108, and 109 as seeking to amend the complaint to include Apple Inc., Tom Lynch and Tom Lynch Co., Sony Entertainment, and Tionne Tenese Watkins a/k/a T-Boz and Shee Entertainment, respectively, as defendants in this action. I construe Docket No. 90 as a motion to enforce Magistrate Judge Collings's September 20, 2010, order and deny Docket No. 104, entitled "Motion for Clarification to Assented Motion of the Defendants' Extension of Time to Oppose Motion to Enforce," as duplicative because it is more accurately construed as a reply to the defendants' opposition to McGee's motion to enforce the discovery order. *See Ayala Serrano v. Lebron Gonzalez*, 909 F.2d 8, 15 (1st Cir. 1990) (instructing that "*pro se* pleadings are to be liberally construed, in favor of the *pro se* party").